UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

————

**No. 24-1244**

————

**UNITED STATES OF AMERICA,**

Plaintiff-Appellant,

v.

**RONALD NORVALE WILLIAMS**

Defendant-Appellee.

————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
No. 23-CR-20201

————

**APPELLEE'S BRIEF**

————


Celeste C. Kinney
Brandy Y. Robinson
**FEDERAL COMMUNITY DEFENDER**
Counsel for Ronald Norvale Williams
613 Abbott St., Suite 500
Detroit, Michigan 48226
(313) 967-5843

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF JURISDICTION ........................................................ 1

STATEMENT SUPPORTING ORAL ARGUMENT ................................ 2

ISSUES PRESENTED ........................................................................ 3

STATEMENT OF THE CASE .............................................................. 4

SUMMARY OF ARGUMENT .............................................................. 5

ARGUMENT ...................................................................................... 7

    I.    There are unresolved questions following *Bruen* and *Rahimi*. ................................................................................. 7

    II.    Williams's framework is unmoored from the text of § 922(g)(1) and the Second Amendment. ........................... 11

        A.    *Williams* announced a new "dangerous person" framework. ......................................................... 11

        B.    *Williams* does not provide sufficient guidance to district courts on analyzing a defendant's dangerousness. ....................................................... 13

        C.    *Williams* impermissibly shifts the burden to the defendants and fails to explain the burden it imposes. ............................................................... 15

    III.    Under *Williams,* Williams is not dangerous, and § 922(g)(1) is unconstitutional as applied to him. ................................. 20

        A.    Williams's youth at the time of his convictions and the age of the convictions counsel against a finding of dangerousness. Similarly, his parole status should not warrant a finding of dangerousness. .... 21

        B.    Consideration of unproven allegations is inappropriate under *Williams.* ............................... 25

    IV.    *Williams* creates two due process problems. ....................... 26

A.      Section 922(g)(1) is overbroad and thus facially unconstitutional....................................................26

B.      *Williams's* "dangerous person" test is void for vagueness.................................................................28

CONCLUSION ...................................................................... 34

DESIGNATION OF DISTRICT COURT DOCUMENTS....................... 35

CERTIFICATE OF COMPLIANCE......................................... 35

CERTIFICATE OF SERVICE................................................. 37

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Aptheker v. Sec'y of State*, 378 U.S. 500 (1964)..................................26, 27

*Colorado v. Connelly,* 479 U.S. 157 (1986) .............................................20

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................7, 8, 9

*Graham v. Florida*, 560 U.S. 48 (2010)....................................................22

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .................................29

*Johnson v. United States*, 576 U.S. 591 (2015).......................................29

*Jones v. Mississippi*, 593 U.S. 98 (2021)................................................22

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019).........................9, 16, 17, 18

*Miller v. Alabama*, 567 U.S. 460 (2012)...........................................21, 22

*Miller v. Field,* 35 F.3d 1088 (6th Cir. 1994) .........................................14

*NAACP v. Alabama*, 377 U.S. 288 (1964)................................................27

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)
.............................................................................................. passim

*Nix v. Williams*, 467 U.S. 431 (1984) ......................................................20

*Rehaif v. United States*, 588 U.S. 225 (2019).........................................33

*Sessions v. Dimaya*, 584 U.S. 148 (2018)................................................31

*Shepard v. United States,* 544 U.S. 13 (2005) ........................................31

*Tyler v. Hillsdale Cty. Sheriff's Dep't,* 837 F.3d 678 (6th Cir. 2016)....8, 9

*United States v. Bowers*, 594 F.3d 522 (6th Cir. 2010)...........................20

*United States v. Davis*, 588 U.S. 445 (2019) ........................................... 29

*United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024) ................... 15, 19

*United States v. Goins,* 118 F.4th 794 (6th Cir. 2024) ........................... 24

*United States v. Hansen*, 599 U.S. 762 (2023) ....................................... 28

*United States v. Jackson*, 85 F.4th 468 (8th Cir. 2023) ........ 15, 16, 18, 19

*United States v. Morton*, ---F. 4th---, 2024 WL 5114316 (6th Cir. Dec. 16, 2024) ....................................................................................... 10, 24

*United States v. Rahimi*, 602 U.S. 680 (2024) ............................... passim

*United States v. Scroggins*, 599 F.3d 433 (5th Cir. 2010) ........................ 8

*United States v. Williams,* 113 F.4th 637 (6th Cir. 2024) ............. passim

*United States v. Williams,* 616 F.3d 685 (7th Cir. 2010) ......................... 8

## Statutes

18 U.S.C. § 922(g)(1) ........................................................................ passim

18 U.S.C. § 922(g)(8) ......................................................................... 10, 18

18 U.S.C. § 924(c)(3)(B) ........................................................................... 32

## Other Authorities

Fed. R. Evid. 609 ..................................................................................... 21

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) ........................................................................................................... 9

Mariam Arain, et al., *Maturation of the Adolescent Brian*, 9 Neuro. Disease & Treatment 453 (2013) ....................................................... 22

Nico U.F. Dosenbach et al., *Prediction of individual brain maturity using fMRI,* Science (Sept. 10, 2010) .................................................. 23

U.S.S.C., *Youthful Offenders in the Federal System* (May 2017) ..... 22, 23

# STATEMENT OF JURISDICTION

The government indicted Ronald Norvale Williams with one count of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). (R. 1, Indictment, 1).[1] Mr. Williams filed a motion to dismiss the indictment, arguing that § 922(g)(1) is unconstitutional as applied to him following the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). (R. 13, Motion to Dismiss, 29-56).

The district court granted Mr. Williams's motion to dismiss, agreeing that § 922(g)(1) is unconstitutional as applied to Mr. Williams. (R. 29, Op. & Order, 390-462). The government filed a timely notice of appeal. (R. 34, Notice of Appeal, 516-17). Williams agrees that this Court has jurisdiction under 18 U.S.C. § 3731.

---

[1] Record citations refer to the PageID number.

## STATEMENT SUPPORTING ORAL ARGUMENT

This appeal involves an important question about Williams's rights under the Second Amendment following *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), and *United States v. Williams,* 113 F.4th 637 (6th Cir. 2024), which announced a new "dangerousness" standard, wherein the defendant carries the burden to show he is not "dangerous" and may not be permanently disarmed of his right to carry a firearm. This appeal involves the constitutionality of 18 U.S.C. § 922(g)(1), which is already affecting cases in this, and other, circuits. Williams requests oral argument because of the importance of appellate review of, and guidance to lower courts for, this pressing constitutional issue.

## <u>ISSUES PRESENTED</u>

1.  Is 18 U.S.C. § 922(g)(1) constitutional after *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1 (2022)?

2.  Is 18 U.S.C. § 922(g)(1) unconstitutional as applied to Williams?

3.  Is remand appropriate for consideration of dangerousness as announced in *United States v. Williams,* 113 F.4th 637 (6th Cir. 2024)?

3

## <u>STATEMENT OF THE CASE</u>

The government indicted Williams for one count of violating 18 U.S.C. § 922(g)(1) – Felon in Possession of a Firearm. (R.1, Indict., 1-4). Williams filed a motion to dismiss the indictment, arguing that, as applied to him, 18 U.S.C. § 922(g)(1) is unconstitutional following the Supreme Court's landmark decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). (R. 13, Mtn. to Dismiss, 29-56; R. 16, Gov't. Resp., 59-80). The district court ordered supplemental briefing from both parties. (R. 17, Order, 87-93; R. 18, Def. Supp. Br., 94-96, R. 19, Gov't. Supp. Br., 97-145, R. 22, Def. Second Supp. Br., 181-226).

The district court correctly granted Williams's motion, finding that, following *Bruen*, § 922(g)(1) is unconstitutional as applied to him. (R. 29, Op. & Order, 390-462).

## SUMMARY OF ARGUMENT

The district court correctly granted Williams's motion to dismiss the indictment, as his prosecution for allegedly violating 18 U.S.C. § 922(g)(1) is barred by the Second Amendment following *Bruen*.

During the pendency of Williams's appeal, this Court issued *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024). There, this Court pronounced that § 922(g)(1) is unconstitutional as applied to non-dangerous people with felony convictions. 113 F.4th at 657. *Williams* outlines a framework for determining whether someone is a "dangerous person" subject to permanent disarmament based on their prior conviction(s).

Ronald Williams first maintains that *Williams* is wrongly decided because its analysis is unmoored from the text of § 922(g)(1) and the Second Amendment, as well as the historical record. Separately, *Williams's* interpretation of § 922(g)(1)'s constitutionality under the Second Amendment creates new legal constitutional issues of overbreadth and vagueness.

5

But even if *Williams* remains the controlling standard, this Court should still affirm the district court's decision because Ronald Williams is not dangerous under *Williams*. And if this Court does remand for further proceedings, it should not conduct a dangerousness analysis itself, but rather should allow the district court to conduct that analysis in the first instance. The district court did not have the opportunity to conduct the dangerousness analysis now required by *Williams*. The most prudent course is for this Court to remand this case with instructions for the district court to make the findings required under *Williams*.

## ARGUMENT

### I.    There are unresolved questions following *Bruen* and *Rahimi*.

The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." *Bruen* laid out a new framework to test restrictions on this fundamental right to bear arms. That framework abrogated *District of Columbia v. Heller*, 554 U.S. 570 (2008), as well as Sixth Circuit caselaw relying on *Heller* to uphold the constitutionality of 18 U.S.C. § 922(g)(1), *see, e.g. United States v. Carey*, 602 F.3d 738 (6th Cir. 2010).

Critically, the *Heller* Court stressed that it had *not* canvassed the historical record and determined one way or the other whether relevant history supports modern felon-disarmament laws. 554 U.S. at 626. *Bruen*, in turn, affirmed that *Heller* did not purport to settle any questions beyond those necessary to resolve the petitioners' claims. 597 U.S. at 22.

Further, *Heller*'s statement in a footnote about "presumptively lawful regulatory measures" was dicta—not a holding—that has been superseded by the *Bruen* framework. *See* 554 U.S. at 627, n.26. The

7

constitutionality of felon-disarmament laws was *not* squarely before the Court in *Heller* (or *Bruen*), and any statements in the opinion addressing that question are therefore dicta. *See, e.g., Bruen*, 597 U.S. at 72 (indicating the holding "decides nothing about who may lawfully possess a firearm") (Alito, J., concurring); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *Tyler v. Hillsdale Cty. Sheriff's Dep't,* 837 F.3d 678, 686-87 (6th Cir. 2016) (en banc) (describing "presumptively lawful" language as "dictum"); *United States v. Williams,* 616 F.3d 685, 692 (7th Cir. 2010).

    *Heller* itself indicates that its dicta should not control here. Dissenting in *Heller*, Justice Breyer criticized the reference to longstanding felon-disarmament laws as "*ipse dixit*," noting that the majority "fail[ed] to cite any colonial analogues" to such statutes. 554 U.S. at 721–22. The majority responded that there would "be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* at 635. This rejoinder suggests that *Heller* assumed "felons can be deprived of the [Second Amendment] right *if* that deprivation is consistent with history

and tradition." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 252 (2020) [Greenlee] (emphasis added). The Court's allusion to "expound[ing] upon the historical justifications" for felon-disarmament laws, *Heller*, 554 U.S. at 635, would make no sense if the Court believed felons could be disarmed *regardless* of whether history supported exclusion.

Importantly, felon-disarmament laws are *not* longstanding—at least not in the *Bruen* sense. It appears that no American jurisdiction enacted such a law until the 20th Century, and Congress did not pass the federal statute at issue here until 1938. *Tyler*, 837 F.3d at 708 (Sutton, C.J., concurring) (noting that § 922(g)(1)'s historical pedigree dates only to 1938). *Heller*'s discussion of "longstanding" felon-disarmament laws, therefore, is not just dicta, but dicta based on a factually unsupported (and perhaps unsupportable) premise. *Heller*, 554 U.S. at 721–22 (criticizing reference to longstanding felon-disarmament laws as "*ipse dixit*," noting the majority "fail[ed] to cite any colonial analogues" to such statutes) (Breyer, J., dissenting); *see also Kanter v. Barr*, 919 F.3d 437,

454 (7th Cir. 2019) (Barrett, J., dissenting) (observing that "at least thus far, scholars have not been able to identify" *any* founding-era laws "explicitly imposing—or explicitly authorizing the legislature to impose" permanent disarmament of all felons).

Following *Bruen*, the Supreme Court examined a Second Amendment challenge to 18 U.S.C. § 922(g)(8) in *United States v. Rahimi*, 602 U.S. 680 (2024). There, the Court indicated that *Bruen* requires a court to "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id*. at 681. However, as a panel of this Court recently noted in *United States v. Morton*, ---F. 4th---, 2024 WL 5114316, *6, n. 2 (6th Cir. Dec. 16, 2024), "[t]o be sure, we need a law that is 'relevantly similar,' not a historical twin. But when the same criminal conduct existed at the founding yet carried a different punishment, can we ignore the *lack* of a historical twin?" (emphasis in original). The complete absence of a historical record permanently barring felons from possessing firearms calls into question the application of *Bruen* and its progeny, including this Court's

10

dangerousness standard as pronounced in *Williams*, to § 922(g)(1) challenges.

## II. *Williams*'s framework is unmoored from the text of § 922(g)(1) and the Second Amendment.

*Williams* outlines a framework for determining whether someone is a "dangerous person" subject to permanent disarmament based on their prior conviction(s). This framework, as well as the burden it places on the accused, are unmoored from the text of § 922(g)(1) and the Second Amendment, as well as the historical record.

### A. *Williams* announced a new "dangerous person" framework.

*Williams* tells courts to determine dangerousness based on "categor[ies] of crime." The first category is "crimes against the person," a "historical category [] filled with dangerous and violent crimes like murder, rape, assault, and robbery." 113 F.4th at 658. People convicted of these crimes face, at minimum, an "extremely heavy" burden to show they are not dangerous, but the availability of the death penalty for the enumerated offenses at the founding "might indicate an irrebuttable presumption of dangerousness." *Id*.

The second category consists of crimes "not strictly [] against the person," but that "may nonetheless pose a significant threat of danger." *Id.* at 659. "These crimes do not always involve an immediate and direct threat of violence against a particular person" but may "lead[] to violence" and/or "put someone's safety at risk," this justifying "a finding of danger." *Id.* Crimes in this category include drug trafficking and burglary. *Id.* A person with convictions in this category "will have a very difficult time . . . showing that he is not dangerous." *Id. Williams* provides no support for this burden, historical or otherwise.

The final category of crimes—"the most challenging to address"— includes mail fraud, making false statements, and other crimes that typically "cause no physical harm to another person or the community." *Id. Williams's* description of this category as "challenging" stems from its recognition that no justification for permanent disarmament exists. *Williams*, however, "trust[s] district courts will have no trouble concluding that many of these crimes don't make a person dangerous" and that a person so convicted cannot be constitutionally disarmed. *Id.*

## B. *Williams* does not provide sufficient guidance to district courts on analyzing a defendant's dangerousness.

When evaluating whether a person is dangerous, courts "may consider a defendant's entire criminal record." *Williams,* 113 F.4th at 659–60. This includes unchallenged facts in a PSR or "judicially noticeable information." *Id.* at 660. *Williams* left "the question of what [other] information is relevant for another day." *Id.* at n.12. However, the examples provided in *Williams* imply that courts should not consider arrests not resulting in conviction or unproven factual allegations in the underlying § 922(g)(1) proceedings such as those that may have been proffered at a bond hearing where evidentiary rules do not apply. "[A]n arrest, without more, is quite consistent with innocence." *United States v. Johnson*, 648 F.3d 273, 277–78 (5th Cir. 2011). And *Rahimi* confirms that unproven allegations have no place in determining the propriety of the permanent revocation of a fundamental right. *Rahimi* emphasized that a person subject to a protective order had an opportunity to rebut the allegations against them before having their gun rights temporarily restricted, so, at a minimum, the same protections must apply to permanent restrictions. *Rahimi,* 602 U.S. at 697.

13

The alleged circumstances of an underlying § 922(g)(1) offense are irrelevant for an additional reason: the question for purposes of the statute is whether the "dangerous person" restriction could be constitutionally applied at the time of the gun possession. What a person allegedly did with a gun sometime during that possession has no bearing on the threshold question of whether that person's prior conviction(s) provided a basis for disarming them consistently with the Second Amendment. Typically, indictments are primarily supported by police reports. Police reports are *not* judicially noticeable, as their contents are typically subject to reasonable dispute and there are reasons to question the accuracy of statements contained therein. *See, e.g., Miller v. Field,* 35 F.3d 1088 (6th Cir. 1994) (statements by alleged victim, alleged assailants, other witnesses, and local prosecutor were hearsay within hearsay in police report and, therefore, were inadmissible under public records exception). Considering police reports in evaluating dangerousness could also raise Confrontation Clause concerns.

14

**C. *Williams* impermissibly shifts the burden to the defendants and fails to explain the burden it imposes.**

*Williams* impermissibly shifts the burden of proving lack of dangerousness to the accused. Placing the burden on the accused is incompatible with *Bruen*. *See United States v. Jackson*, 85 F.4th 468, 469–70 (8th Cir. 2023) (Stras, J., dissenting from the denial of rehearing en banc) ("Worse yet, [the panel decision] actually flips the burden. It says that the *defendant,* not the government, must 'show . . . that his prior felony conviction is insufficient to justify the' stripping of Second Amendment rights. … Reversing the burden [] lets [courts] avoid the sort of probing historical analysis *Bruen* requires.") (emphasis in original); *United States v. Duarte*, 101 F.4th 657, 690 (9th Cir. 2024) ("A more faithful application of *Bruen* requires the Government to proffer Founding-era felony analogues that are 'distinctly similar' to Duarte's underlying offenses[.]").

With respect to the first and second categories, *Williams* articulates arbitrary standards the accused must overcome to prove lack of dangerousness. *Williams*, 113 F.4th at 658. The burden associated with the first category, for example, is predicated on *Williams*'s suggestion

15

that people convicted of committing crimes against the person may be permanently disarmed because, at the founding, such crimes were punishable by death. *Id*. But this "greater-includes-the-lesser argument" "cannot be right if the greater—the widespread use of death as the punishment for a felony—was itself a fiction." *Jackson*, 85 F.4th at 473 (Stras, J., dissenting from the denial of rehearing en banc). Fiction it was.

"[T]he premise of th[e] argument—that the states permanently extinguished the rights of felons, either by death or operation of the law, in the eighteenth and nineteenth centuries—is shaky." *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). In fact, "[d]uring the period leading up to the founding, the connection between felonies and capital punishment started to fray." *Id*. at 459. "Throughout the seventeenth and eighteenth centuries, capital punishment in the colonies was used 'sparingly,' and property crimes including variations on theft, burglary, and robbery 'were on the whole, not capital.'" *Id*. (quotation omitted).; *see also id.* at 461 ("Capital punishment was less pervasive than one might think."). Although "many crimes remained eligible for the death penalty," "the extent to which that was true varied by state. Death, however, no longer

16

inevitably followed a felony conviction." *Id.* at 459. The upshot "is that the consequences of a felony conviction were not as categorically severe" as *Williams* suggests. *Id.* at 461.

The same holds true for "civil death," "a status 'very similar to natural death in that all civil rights were extinguished." *Id.* at 459 (quotation omitted). Civil death "applied exclusively to life sentences and only if authorized by statute." *Id.* at 461. "Felons serving a term of years did not suffer civil death; their rights were *suspended* but not destroyed. In sum, a felony conviction and the loss of all rights did not necessarily go hand-in-hand." *Id.* (emphasis added).

The fact that people convicted of felonies were stripped of all rights because they were dead "does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society." *Kanter,* 919 F.3d at 461. If *Williams* is right, "the government can presumably strip felons of other core constitutional rights too. Dead men do not speak, assemble, or require protection from unreasonable searches and seizures . . . Or perhaps we can try felonies without a jury because they were once

17

punishable by death." *Jackson*, 85 F.4th at 474 (Stras, J., dissenting from denial of rehearing en banc) (internal citations omitted); *see also Kanter*, 919 F.3d at 461–63 (Barrett, J., dissenting) ("[W]e wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding."). In short, neither execution nor civil death suggest that the Framers understood the pre-existing Arms right to exclude felons.

Like *Williams, Rahimi* also embraced a greater-includes-the-lesser argument. But in that case, which addressed a different subsection of § 922(g), the Court reasoned that "[t]he going armed laws provided for imprisonment, and if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Rahimi*, 602 U.S. at 682 (internal citation omitted). Because those who violated the going armed laws could be temporarily imprisoned, temporary disarmament while a protective order remains in effect is lesser punishment. In stark contrast, § 922(g)(1), which carries a statutory maximum penalty of 15 years' imprisonment, not life

18

imprisonment or death, carries a penalty of permanent disarmament. The permanent loss of a fundamental constitutional right is not a lesser penalty of temporary imprisonment.

In any event, Williams disagrees that he should shoulder the burden of proving he is not dangerous. If, however, the burden belongs to him, then he should only be required to prove lack of dangerousness by a preponderance of the evidence. This is consistent with historic practice. For example, "during the Revolutionary war," some states "required men above a certain age to swear a 'loyalty oath' to the revolutionary cause." *Jackson*, 85 F.4th at 471-72, 476 (Stras, J., dissenting from the denial of rehearing en banc). If they took the oath, they were permitted to keep their arms. In many instances, even those who refused to pledge their loyalty "could still keep their weapons" if they provided adequate justification. *Duarte*, 101 F.4th at 683. And Catholics, who lost their right to arms for a time, could retain their arms "for the Defence of His House or Person." *Id*. at 685 (quotation omitted). In short, defeating a presumption of dangerousness at the founding required surmounting a very low hurdle.

19

A preponderance of the evidence standard is also consistent with the standard the government must satisfy to overcome constitutional rights in other settings. *See, e.g. Nix v. Williams*, 467 U.S. 431, 444 (1984) (exclusionary rule does not prevent the introduction of evidence "[i]f the prosecution can establish by a preponderance of the evidence that the" inevitable discovery exception applies); *Colorado v. Connelly,* 479 U.S. 157, 168 (1986) (holding that the government need only prove waiver of *Miranda* rights by a preponderance of the evidence). If a preponderance of the evidence suffices for the government to overcome constitutional protections, the same standard should apply to those seeking restoration of their constitutional rights. The Second Amendment does not protect "a second-class right," so there is no basis to impose a heavier burden. *Bruen*, 597 U.S. at 70 (quotation omitted).

## III.    Under *Williams,* Williams is not dangerous, and § 922(g)(1) is unconstitutional as applied to him.

This Court reviews *de novo* whether the Second Amendment bars Williams's prosecution and conviction under 18 U.S.C. § 922(g)(1). *United States v. Bowers*, 594 F.3d 522, 527 (6th Cir. 2010).

**A. Williams's youth at the time of his convictions and the age of the convictions counsel against a finding of dangerousness. Similarly, his parole status should not warrant a finding of dangerousness.**

Williams was convicted in 1987 for first- and second-degree murder arising from a single incident. These convictions fall within the first category of crimes under *Williams*. However, Williams was 17 years old at the time of the killings. Following *Miller v. Alabama,* 567 U.S. 460 (2012), and after evaluating Williams's remarkable growth and rehabilitation during his 29 years in prison, he was resentenced in 2016 from the original penalty of non-parolable life to a term of 25 to 60 years.

*Williams* does not give any guidance to the district courts as to how it should weigh factors such as the defendant's age at the time of their conviction or the age of the conviction itself. However, the Court may take judicial notice of both. Convictions over 10 years old are sometimes recognized as having less probative value in regarding a person's current demeanor. *See* Fed. R. Evid. 609 (regarding the admissibility of previous convictions to prove a witness's character for truthfulness). And an offense committed while still a minor is generally considered to have less probative value in determining the present characteristics of a person.

21

*See* Fed. R. Evid. 609 (limiting the admissibility of juvenile adjudications as probative of truthfulness); *Graham v. Florida*, 560 U.S. 48, 68 (2010) ("Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults."). The age of the convictions, and Williams's youth at the time, are both properly considered under *Williams*.

His age is especially relevant because, just a few years ago, the Supreme Court unequivocally stated that "youth matters" in determining punishment. *Jones v. Mississippi*, 593 U.S. 98, 105 (2021). The Supreme Court also has acknowledged "what 'any other parent knows'" and what research has repeatedly shown: juveniles and emerging adults are different. *Miller v. Alabama*, 567 U.S. 460, 471 (2012). Developments in brain science continue to show fundamental differences between juvenile and adult minds, including in the parts of the brain involved in behavior control. Mariam Arain, et al., *Maturation of the Adolescent Brian*, 9 Neuro. Disease & Treatment 453 (2013), https://perma.cc/2FBA-WRVJ. The prefrontal cortex controls impulse control, complex decision-making, inhibition, and planning. *Id.*; *see also* U.S.S.C., *Youthful Offenders in the*

*Federal System*, at 5 (May 2017), https://perma.cc/K8SM-D3PU (noting a voluminous body of neuroscience research "recogni[zing] that people may not gain full reasoning skills and abilities until they reach age 25 on average"); Nico U.F. Dosenbach et al., *Prediction of individual brain maturity using fMRI,* Science (Sept. 10, 2010), https://perma.cc/V7U5-5WKE (longitudinal study tracking brain development in 5,000 children and finding their brains did not reach full maturity until *at least* age 25). Even if the court finds that Williams's prior convictions themselves are "dangerous", his youthful age at the time counsels against heavy consideration and a finding that he is dangerous enough to be permanently disarmed before even reaching the majority age of brain maturity.

The government ignores both Williams's age at the time of the convictions and the age of the convictions themselves, seemingly because common sense counsels against heavy consideration under *Williams*. Despite this, it invites the Court to find that the nature and circumstances of the crime establish dangerousness, making remand inappropriate. This Court should decline to do so. This Court is "a court

23

of review, not first view." *United States v. Houston,* 792 F.3d 663, 669 (6th Cir. 2015).

The government further relies on *United States v. Goins,* 118 F.4th 794 (6th Cir. 2024) for the assertion that Williams's parole status at the time of his alleged possession supports a finding of dangerousness. It cannot. *Goins* relies on faulty analysis. In some cases where a defendant is temporarily barred from firearm possession as a condition of pretrial release, or as a condition of probation for a misdemeanor offense, there is a possibility that their right to possess firearms will be restored upon resolution of their criminal case. This Court suggested the justifications for temporary disarmament is "easily … extended from the pretrial detention context to the context of probation, parole, or supervised release," 118 F.4th at 803, but § 922(g)(1) is a permanent deprivation of the Second Amendment right, not a temporary one. As a panel of this Court recently recognized in *Morton*, an analysis of a temporary firearm deprivation is "less helpful when considering the constitutionality of permanent disarmament under § 922(g)(1)." 2024 WL 5114316, at *6, n.2. Despite the tension *Goins* creates, if the Court must consider Williams's

24

parole status, it should consider the fact that Williams was granted parole because of his pro-social behavior while in prison.

## B. Consideration of unproven allegations is inappropriate under *Williams.*

The government claims Williams possessed a loaded stolen gun along with cocaine. Williams has neither pled nor been found guilty of those allegations. Though *Williams* left the question of what information is relevant under the dangerousness standard for another day, it explicitly allows for district courts to consider "judicially noticeable information." Under the Federal Rules of Evidence, the kinds of facts that may be judicially noticed are those "generally known within the trial court's territorial jurisdiction," such as locations and the weather, and those that "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned," such as a defendant's age at the time of conviction. *See* Fed. R. Evid. 201(b)(1-2). Unproven allegations that have only met the low bar of probable cause are certainly subject to reasonable dispute and cannot contribute to a finding that a person is dangerous enough to be permanently stripped of their rights under the Second Amendment.

If the Court is inclined to consider the allegations of the underlying indictment in this case, it does not warrant a finding of dangerousness. However, as argued above, it is the role of the district court, not this Court, to conduct the dangerousness analysis and this Court should remand.

## IV. *Williams* creates two due process problems.

Separately, *Williams* acknowledges that § 922(g)(1) is overbroad. It goes on to violate the separation of powers and vagueness doctrines by promulgating a textually unsupported "dangerous person" test. The statue is now (1) overbroad; and (2) vague.

### A. Section 922(g)(1) is overbroad and thus facially unconstitutional.

Despite *Williams's* pronouncement that facial challenges to § 922(g)(1) are essentially moot, *Williams* accepts that § 922(g)(1) is unconstitutional as applied to non-dangerous felons, making the statute overbroad, and facially unconstitutional, as written.[2]

---

[2] Although overbreadth challenges are most often raised in the First Amendment context, the Supreme Court concluded that a First Amendment overbreadth case provided the appropriate analysis for a right-to-travel challenge. *See Aptheker v. Sec'y of State*, 378 U.S. 500

Under the overbreadth doctrine, "[a] governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964). Even if the "governmental purpose" is "legitimate," "that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in light of less drastic means for achieving the same basic purpose." *Aptheker*, 378 U.S. at 508 (quotation omitted).

Here, as in *Aptheker*, § 922(g)(1)'s "clarity and preciseness" "make it impossible to narrow its indiscriminately cast and overly broad scope without substantial rewriting." *Id.* at 515. It is not the prerogative of unelected judges to rewrite federal statutes, as doing so violates the separation of powers. Yet this is precisely what *Williams* did in announcing its "dangerous person" test. It did so despite the instruction

---

(1964). Moreover, *Rahimi* suggests that due process challenges are available in the Second Amendment context. 144 S. Ct. at 1903 n.2.

that when confronted with a statute that sweeps too broadly, courts are to "hold [the] statute facially unconstitutional even though it has lawful applications, and even at the behest of someone whom the statute can be lawfully applied." *United States v. Hansen*, 599 U.S. 762, 769 (2023); *see also id.* at 770 ("[T]he overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak.").

Section 922(g)(1) is overbroad, making it facially unconstitutional.

## B. *Williams's* "dangerous person" test is void for vagueness.

The *Williams* Court "remedied" the overbreadth problem by engrafting a textually untethered dangerousness test on to § 922(g)(1). Problematically, the test is impermissibly vague and unworkable.

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. Am. V. Supreme Court "cases establish that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites

28

arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).

"In our constitutional order, a vague law is no law at all." *United States v. Davis*, 588 U.S. 445, 447 (2019). "Vague laws . . . hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges." *Id.* They allow "for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Relatedly, when "a vague statute 'abut(s) upon sensitive areas of basic [Second] Amendment freedoms,' it 'operates to inhibit the exercise of (those) freedoms.'" *Id.* (first and third alterations in original) (quotation omitted). All these intolerable risks exist with *Williams*'s "dangerous person" test.

The test creates three tiers or "categor[ies] of crimes." *Williams*, 113 F.4th at 658. One category includes "*dangerous* and *violent* crimes *like* murder, rape, assault, and robbery." *Id.* (emphases added). Reading this non-exhaustive list, one is left to wonder whether *Williams* is importing a "violent felony" analysis like that once used in the Armed Career

29

Criminal Act (ACCA). *See* 18 U.S.C. § 924(e). But that cannot be, as federal courts' attempts to define "violent felony" for ACCA purposes have yielded "repeated attempts and repeated failures to craft a principled and objective standard [for that term,] confirm[ing] its hopeless indeterminacy." *Johnson*, 576 U.S. at 598 (holding ACCA's residual clause unconstitutionally vague because it "denie[d] fair notice to defendants and invite[d] arbitrary enforcement by judges"). Does this category allow judges to disarm anyone convicted of an offense involving the use of force? If lawyers cannot answer the question, odds are a layperson will not be able to either.

*Williams* disclaims the idea that "courts facing as-applied challenges must find 'categorical' matches to show a defendant is dangerous," and even calls on district courts to make decisions "depending on the unique circumstances of the individual defendant." *Williams*, 113 F.4th at 660. But, by creating three "categor[ies] of crimes," and instructing judges to determine danger based on "prior convictions," *Williams* resurrects the type of categorical crime of violence inquiry the Supreme Court has thrice invalidated. *Id.*; *Davis*, 588 U.S. at 447;

*Sessions v. Dimaya*, 584 U.S. 148 (2018); *Johnson*, 576 U.S. at 604. *Williams* emphasizes the relevance of prior convictions, *not* the person convicted. "[T]he only plausible interpretation" of this test is that it requires use of the categorical approach. *Johnson*, 576 U.S. at 605 (quotation omitted). For those like Williams, it is "utter[ly] impracticabl[e]" to require a court "to reconstruct, long after the original conviction, the conduct underlying the conviction."[3] *Id.* at 604.

*Williams*'s second "category of crimes" suffers the same indeterminacy problem. These crimes, though not strictly against a person, "may nonetheless pose a significant threat of danger" because such crimes may "lead[] to violence" and/or "put someone's safety at risk." *Williams*, 113 F.4th at 659. Unlike a violent felony that has the use of force as an element, this is an even more amorphous category. In fact, this category sounds like the residual clause struck down in *Davis*, which

---

[3] This is so even when a court has the "charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." *Shepard v. United States*, 544 U.S. 13, 16 (2005). These documents do not always provide a full account of what happened as would be necessary to determine dangerousness based on actual conduct.

provided that a crime of violence is a felony "that by its very nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 588 U.S. at 449 (quoting 18 U.S.C. § 924(c)(3)(B)).

That a categorical approach is called for is confirmed by *Williams*'s direction that district courts make "informed judgment[s] about how criminals commonly operate." 113 F.4th at 660. How do judges know how criminals commonly operate? "A survey? Expert evidence? [Law and Order?] Google? Gut instinct?" *Johnson*, 576 U.S. at 597 (quotation omitted). Fortunately, the Supreme Court does not allow "the imposition of criminal punishment" to "depend on a judge's estimation of the degree of risk posed by a crime[]" based on his or her opinion about how criminals commonly operate. *Davis*, 588 U.S. at 453.

In sum, *Williams*'s "dangerous person" test will prove nearly impossible to apply consistently and there will be "pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider." *Johnson*, 576 U.S. at 601. In addition to being untethered from the Second Amendment's

32

and § 922(g)(1)'s text, *Williams*'s "dangerous person" test does not provide fair notice. Those who have been convicted of felonies and have served their time in custody cannot possibly know in advance of a court's retroactive declaration whether possessing a gun post-conviction is a constitutional entitlement or a federal crime. *Cf. Rehaif v. United States*, 588 U.S. 225, 227 (2019) (holding that to convict someone under § 922(g), the government must prove the defendant not only knew that he possessed a gun, but also knew that "he had the relevant status when he possessed it"). Under the *Williams* test, § 922(g)(1) is so vague as to be facially unconstitutional.

33

## CONCLUSION

This Court should revisit *Williams* and affirm the district court's decision; in particular, the Court should conclude that prosecuting people like Williams violates the Second Amendment in more contexts than prescribed by *Williams*. But, regardless, this Court should either find Williams is not dangerous and affirm the district court, or remand to the district court so that it may conduct a dangerousness analysis considering the new standard announced in *Williams*.

Respectfully submitted,

s/ Celeste C. Kinney
Celeste C. Kinney
Brandy Y. Robinson
FEDERAL COMMUNITY DEFENDER
COUNSEL FOR RONALD NORVALE WILLIAMS
613 Abbott St., Suite 500
Detroit, MI 48226
TELEPHONE: (313) 967-5843
EMAIL: Celeste_Kinney@fd.org

Dated: January 2, 2025

34

## DESIGNATION OF DISTRICT COURT DOCUMENTS

Williams designates the following filings in the district court's record as relevant documents:

| Record Number | Description | Page ID |
|---|---|---|
| 1 | Indictment | 1-4 |
| 13 | Williams's Motion to Dismiss | 29-56 |
| 16 | Government's Response to Williams's Motion to Dismiss | 59-80 |
| 17 | Order Requiring Supplemental Briefing | 87-93 |
| 18 | Williams's First Supplemental Briefing | 94-96 |
| 19 | Government's Supplemental Briefing | 97-145 |
| 22 | Williams's Second Supplemental Briefing | 181-226 |
| 29 | Opinion and Order Granting Williams's Motion to Dismiss | 390-462 |
| 34 | Notice of Appeal | 516-517 |

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains fewer than 13,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). The brief contains 5,618 words.

s/ Celeste C. Kinney
**FEDERAL COMMUNITY DEFENDER**
COUNSEL FOR RONALD NORVALE WILLIAMS
613 Abbott St., Suite 500
Detroit, MI  48226
TELEPHONE: (313) 967-5843
EMAIL: Celeste_Kinney@fd.org

Dated: January 2, 2025

## CERTIFICATE OF SERVICE

I certify that on January 2, 2025, I electronically filed the foregoing

paper with the Clerk of the Court using the ECF system, which will send

notification to opposing counsel of record.

s/ Celeste C. Kinney
**FEDERAL COMMUNITY DEFENDER**
COUNSEL FOR RONALD NORVALE WILLIAMS
613 Abbott St., Suite 500
Detroit, MI  48226
TELEPHONE: (313) 967-5843
EMAIL: Celeste_Kinney@fd.org

Dated:  January 2, 2025

37